# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39412**

————————————

### UNITED STATES
*Appellee*

**v.**

### Jason W. CHERRY
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 August 2019

————————————

*Military Judge:* Mark W. Milam (motions); Vance H. Spath (motions); Donald R. Eller, Jr.

*Approved sentence:* Dishonorable discharge, confinement for 8 years, and reduction to E-1. Sentence adjudged 13 October 2017 by GCM convened at Ellsworth Air Force Base, South Dakota.

*For Appellant:* Major Dustin J. Weisman, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before MAYBERRY, MINK, and LEWIS, *Appellate Military Judges*.

Judge LEWIS delivered the opinion of the court, in which Chief Judge MAYBERRY and Senior Judge MINK joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

LEWIS, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual

assault of a child and three specifications of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for eight years, and reduction to the grade of E-1. The convening authority denied Appellant's requests to defer imposition of his reduction to E-1 and to defer the mandatory forfeitures of all pay and allowances until action. The convening authority approved the adjudged sentence at action.

Appellant raised through counsel three issues: (1) whether the military judge erred by admitting into evidence a forensic laboratory report regarding cell phone extractions as a business record; (2) whether the military judge erred when instructing the court members on the Government's burden of proof in findings; and (3) whether Appellant's convictions are factually sufficient.

Appellant submitted seven additional issues for our consideration, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). One issue, whether Appellant's convictions are legally and factually sufficient on additional grounds than those raised by his counsel, warrants further discussion. We consolidate this discussion with the factual sufficiency issue raised through Appellant's counsel.

We considered the other six issues Appellant personally raised: (1) whether the military judge erred by denying the Mil. R. Evid. 412 motion;[2] (2) whether the military judge improperly handled court member questions; (3) whether Appellant is entitled to relief for illegal pretrial punishment; (4) whether Appellant's sentence is inappropriately severe; (5) whether Appellant's court-martial was tainted by unlawful command influence; and (6) whether the military judge erred by determining a dishonorable discharge was a mandatory punishment. These six issues warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Additionally, though not raised by Appellant, we considered whether a missing portion of Appellant's clemency submission in the original record of

---

[1] All references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are found in the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[2] Both Appellant's declaration and his brief on this issue reference sealed materials but were filed not under seal. *See* A.F. Ct. Crim. App. R. 5.3(a) (19 May 2017). Additionally, Appellant's declaration contains many references to personally identifiable and sensitive information. *See* A.F. Ct. Crim. App. R. 5.3(b)(1) (19 May 2017). We order corrective action in the decretal paragraph.

trial required new post-trial processing or other corrective action. We need not determine whether the missing portion of the clemency submission constitutes prejudicial error as the staff judge advocate's recommendation (SJAR) and the Defense's clemency submission both mischaracterized the convening authority's power under Article 60, UCMJ, 10 U.S.C. § 860. As the addendum to the SJAR did not correct these errors, we find material prejudice and order new post-trial processing with conflict-free defense counsel.

# I. BACKGROUND

Each of Appellant's convictions involve sexual misconduct with his stepdaughter, SR, when she was between the ages of 11 and 13 years old. SR turned 14 years old by the time of trial. The charged timeframe spans Appellant's last two duty assignments: Whiteman Air Force Base (AFB), Missouri, and Ellsworth AFB, South Dakota. Appellant's most serious offense, sexual assault of a child, occurred when he penetrated SR's vagina with his fingers on divers occasions while they lived at Ellsworth AFB during 2015. SR described the last time Appellant digitally penetrated her vagina, on 9 December 2015, as particularly rough. This particular incident was pivotal to SR's decision to report Appellant's sexual misconduct the next day to an adult.

Appellant's other three convictions involve sexual abuse of a child by committing lewd acts upon SR by: (1) touching SR's genitalia with his hand before she turned 12 years old at Whiteman AFB; (2) touching SR's face and body with his genitalia, on divers occasions, after she turned 12 years old when they lived on Ellsworth AFB; and (3) intentionally exposing his genitalia to SR, on divers occasions, after she turned 12 years old at Ellsworth AFB.

As mentioned above, SR first reported Appellant's sexual misconduct to an adult on 10 December 2015. SR chose a trusted adult, Ms. TB, her middle school guidance counselor. Ms. TB knew SR well from teaching her in class in a prior year. SR's reporting decision came not only after Appellant's rough digital penetration of her vagina, but also after SR did research on what "rape" was and confided in a close male friend, DC, that Appellant "fingered" her.

The night of the last sexual assault, SR was alone in her bedroom on Whiteman AFB, with the lights off, using her cell phone. On her phone, SR listened to music from the band Train from their California 37 record. SR exchanged messages with her male friend, DC. At this point, SR heard her mother (and Appellant's wife), NC, go downstairs and then SR heard Appellant's footsteps coming to her room. SR put her phone under her pillow

so she would not get in trouble for being on her phone so late and pretended to be asleep. Appellant entered SR's room, looked at SR, and then put his penis on her face by her mouth. SR moved her head towards the wall. Appellant then put his hand inside SR's shorts and put his fingers in SR's vagina. At trial, SR described it as "rough" and that it "hurt a lot" so she moved to try and get Appellant to stop. He did not stop. When NC started back up the stairs, Appellant left SR's bedroom and shut the door. SR started crying. NC asked Appellant if he was in SR's room and Appellant said no. NC stated she thought she heard the door close. Appellant said he was turning off the lights.

After Appellant left her room and about 10 minutes after she first put her phone under her pillow, SR looked at her phone. She had four new messages from DC. The last message was "Hello" as SR had not responded to the prior three messages. As she messaged DC back, SR asked him to "define rape." After DC inquired "why," SR did an Internet search herself for "rape." SR messaged DC that she thought her stepdad raped her because he "came in" and "put his 'thing' in my face and started fingering me." SR described for DC shifting her body so Appellant would stop because she was too scared to say anything. She explained Appellant kept doing it until her mom came upstairs. Shortly after this message exchange with DC, SR visited the DoD Safe Helpline website. SR decided to report because "it was rough" and she "was worried that if [she] didn't say anything it was going to get worse."

The next morning SR's best friend at Ellsworth AFB, GQ, agreed to accompany SR to Ms. TB's office. GQ, a female in the same grade as SR, knew that SR wanted to see Ms. TB to talk about what was going on at home with SR's stepdad. SR did not share specifics with GQ about what happened on 9 December 2015, but GQ already knew some details about how Appellant behaved inappropriately from earlier discussions with SR. Specifically, in September 2015, about two months before SR reported to Ms. TB, SR disclosed to GQ via text message and in person that Appellant made her uncomfortable by walking into her room, standing in her doorway or walking around without clothes. After GQ learned how Appellant behaved, she encouraged SR to tell her mom, NC. SR replied that she did not want her younger brother, then 3 years old, to have no dad.

Once inside Ms. TB's office with GQ, SR tried to tell Ms. TB what happened but could only say it was "really, really, really bad." Ms. TB observed SR's demeanor as nervous, embarrassed, and smiling a lot. Ms. TB explained the limits of confidentiality to the two girls as she was mandated under state law to report suspected abuse. SR stated "we know." SR did not want to say out loud what happened to her so Ms. TB offered to let SR write

it down. When SR still had a hard time writing it down, Ms. TB chose to leave her office to give SR some space. GQ remained with SR to comfort her.

By the time Ms. TB returned, SR had written down *inter alia* that her stepdad, Appellant, touched her with "his thing" and his hands. In her findings testimony, Ms. TB described what happened after she received the note:

> I read it. I said okay, I smiled at her, and I said I have to give this to somebody, and I said this is a safety issue, and she said I know, I know, and I hugged her and I smiled at her and I hugged [GQ] and they hugged each other, and said I'm proud of you it's hard, it took a lot of courage to write this down . . . .

Ms. TB took the note and notified the appropriate school officials. Later that morning, a school official notified the Air Force Office of Special Investigations (AFOSI) about SR's accusations. An investigation ensued with Special Agent (SA) TW as lead agent. SA TW and another AFOSI agent, SA IP, traveled to SR's school and SA IP interviewed SR.

After SR's interview, SA TW located NC at the Ellsworth Base Exchange (BX) in the early afternoon. SA TW intended to meet with NC alone but Appellant was with NC at the BX. SA TW told both NC and Appellant the agents "needed to talk to them at the detachment and that there was an incident with their child." NC immediately asked "what's going on" while appearing to SA TW to be scared and shocked with her hands frozen in the air. Appellant said nothing. According to SA TW, he appeared "pale" and "scared" with a vein "popping out on his forehead."

As AFOSI continued their investigation, various agents collected relevant evidence for forensic testing. Appellant underwent a sexual assault forensic examination (SAFE) on 10 December 2015. The SAFE for SR could not be completed until the late morning of 11 December 2015 as the first facility AFOSI attempted to use could not perform a SAFE on a minor. AFOSI collected several items from SR's bedroom and the shorts she wore in bed on the evening of 9 December 2015. AFOSI also obtained the cellphones of SR, NC, and Appellant. AFOSI sent the collected evidence to two forensic laboratories for testing.

The United States Army Criminal Investigation Laboratory (USACIL) performed DNA testing on: (1) the swabs collected from Appellant's and SR's SAFE kits; and (2) the shorts SR wore. USACIL's most relevant results included: (1) Appellant's DNA was not found on the vaginal swabs collected from SR; (2) SR's DNA was not found under the fingernail swabs of Appellant; and (3) male DNA was found on the inside of the shorts SR wore, but no

DNA profile could be obtained, possibly because there was not enough cellular material on the inside of the shorts.

The Defense Cyber Crime Center/Computer Forensic Laboratory (formerly known as DCFL) analyzed the cell phones of SR, NC, and Appellant. Mr. TH, the forensic examiner, created a PowerPoint timeline from SR's cell phone for use at Appellant's trial. The PowerPoint timeline showed many of the text messages, music played, website searches and Internet activity on SR's phone from late on 9 December 2015 to early 10 December 2015. The PowerPoint timeline report showed that the user of SR's phone: (1) listened to music from the band Train from the California 37 record; (2) engaged in no user activity from 23:45.27 to 23:55.05 hours on 9 December 2015; and (3) did a web search for "Rape" at 23:57.40.

Mr. TH also created a forensic laboratory report at the time he analyzed the phones. For SR's phone, Mr. TH's forensic laboratory report contained much of the same information that was in his PowerPoint timeline, but his forensic report also included a timeline of NC's phone activity. This activity was limited to website searches and Internet activity based on the extraction of NC's phone. Neither Mr. TH's forensic laboratory report nor his Power-Point timeline addressed the extraction of Appellant's cell phone. Mr. TH explained at trial that Appellant's phone activity was limited to the early morning of 10 December 2015 and only related to a travel itinerary and associated receipts.

We will address further the PowerPoint timeline from SR's phone and the omission of NC's phone activity from the timeline when we analyze the admissibility of Mr. TH's forensic laboratory report in Appellant's first assignment of error. We will further address the evidence supporting each of Appellant's convictions and the multitude of challenges Appellant raises to that evidence when we analyze legal and factual sufficiency.

## II. DISCUSSION

### A. Business Record Exception

#### 1. Additional Background

In the middle of the Prosecution's case-in-chief, senior defense counsel objected to Mr. TH's forensic laboratory report which showed the user activity from the phones of both SR and NC. Trial defense counsel argued the report was prepared in anticipation of litigation and therefore could not qualify as a

business record under Mil. R. Evid. 803(6).[3] Alternatively, trial defense counsel argued the exhibit should be excluded under Mil. R. Evid. 403 as misleading and confusing to the members because the forensic laboratory report was incomplete.

The military judge expressed his displeasure with the timing of senior defense counsel's oral objection and the decision not to file a motion in limine.[4] The military judge noted the court's scheduling order required motions to be filed two weeks prior to trial. The military judge found no good cause for the senior defense counsel's failure to follow the court's scheduling order. The military judge fully addressed the substance of the objection notwithstanding his concerns about the lack of timeliness.

In response to the objection, the Prosecution called Mr. TH to lay the foundation for the exhibit to be qualified as a business record. After laying the foundation, the Prosecution argued the report should be admitted as "forensic reports" are specifically listed as a type of business record in Mil. R. Evid. 803(6). In responding to the Mil. R. Evid. 403 objection, the Prosecution argued the forensic laboratory report clarified the issues rather than confusing them and would help the members understand the steps that Mr. TH took as an examiner.

The military judge overruled the objections, stating that he was mindful of the case law on the Confrontation Clause of the Sixth Amendment[5] but that Mr. TH as the author of the reports was testifying and subject to cross-examination. The military judge concluded Mil. R. Evid. 803(6) still provided for a business records exception that applied to this forensic laboratory report. On the Mil. R. Evid. 403 objection, the military judge found the report highly probative to provide the members a timeline, context, and corroboration. Citing the Mil. R. Evid. 403 balancing test, he found the danger of misleading or confusing the issues to be low and that the probative value was not substantially outweighed by the danger of unfair prejudice.

---

[3] Mil. R. Evid. 803(6) is actually titled *Records of a Regularly Conducted Activity*. This opinion will use the term "business records."

[4] In contrast, Appellant's brief on this issue is approximately 31 pages long and Government's Answer is approximately 11 pages long.

[5] U.S. CONST. amend. VI.

Before this court, Appellant presents a thorough recitation that Mr. TH's report was made in anticipation of litigation and cannot be admissible as a business record as it is inherently unreliable.[6]

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion. 'A military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect.'" *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted) (quoting *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)).

A record of an act, event, condition, opinion or diagnosis is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness, if the following five conditions are met:

(1) the record was made at or near the time by . . . someone with knowledge;

(2) the record was kept in the course of a regularly conducted activity of a uniformed service, business, institution, association, profession, organization, occupation, or calling of any kind, whether or not conducted for profit;

(3) making the record was a regular practice of that activity;

(4) all these conditions are shown by the testimony of the custodian or another qualified witness . . .; and

(5) the opponent does not show the source of the information or the method or circumstance of preparation indicate a lack of trustworthiness. Records of regularly conducted activities include but are not limited to . . . *forensic laboratory reports* . . . .

Mil. R. Evid. 803(6)[7] (emphasis added).

"Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). "Although not every business record is necessarily nontestimonial . . . the charac-

---

[6] Appellant also notes the report was not a summary prepared under Mil. R. Evid. 1006. We do not address this point as the proponent of the evidence at trial did not argue that Mil. R. Evid. 1006 governed its admissibility and the military judge entered no ruling on the applicability of this rule.

[7] Mil. R. Evid. 803(6)'s five subprovisions are labeled (A–E).

teristics that distinguish documents prepared 'in the course of a regularly conducted business activity' from those prepared 'in anticipation of litigation' under [Mil. R. Evid.] 803(6) . . . are also indicative of an administrative purpose rather than an evidentiary purpose." *United States v. Tearman*, 72 M.J. 54, 61 (C.A.A.F. 2013) (internal citations omitted). We have held before "that when a document meets the criteria of Mil. R. Evid. 803(6), and *it has been sanitized to remove any of its testimonial character* . . . it is well within the military judge's discretion to admit it as evidence." *United States v. Thompson*, No. ACM S31996 (recon), 2014 CCA LEXIS 569, at \*15 (A.F. Ct. Crim. App. 6 Aug. 2014) (unpub. op.) (emphasis added).

Evidence otherwise admissible under Mil. R. Evid. 803(6), like other evidence, may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the members . . . ." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent "a clear abuse of discretion." *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (quoting *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)).

The test for whether a nonconstitutional error was harmless is "'whether the error itself had substantial influence' on the findings." *United States v. Walker*, 57 M.J. 174, 178 (C.A.A.F. 2002) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "Whether an error, constitutional or otherwise, was harmless, is a question of law that we review de novo. . . . For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings." *United States v. Hall*, 66 M.J. 53, 54 (C.A.A.F. 2008) (alteration in original) (additional citation omitted) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)). In assessing whether the admission of evidence had "substantial influence" we consider four factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Clark*, 62 M.J. 195, 200–01 (C.A.A.F. 2005) (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

### 3. Analysis

At the outset, this case presents no Sixth Amendment Confrontation Clause concerns as Mr. TH testified at trial and was subject to cross-examination. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36 (2004). Instead, this case is about the admissibility of a business record when the Confrontation Clause has been satisfied. In this case, the military judge believed the senior defense counsel's objection conflated the Confrontation Clause issues in *Crawford* and *Tearman* into his objection under Mil. R. Evid. 803(6). The

military judge determined that Mil. R. Evid. 803(6) still provided for a business record exception and admitted the report. On appeal, Appellant argues that the military judge was the one conflating the issues. We need not conclude whether the senior defense counsel and/or the military judge conflated any issue. Instead, we note that the confusion we see in the record of trial would have been greatly reduced, if not avoided completely, if the senior defense counsel filed a timely written motion in limine.

We also quickly dispense with Appellant's claim that the evidence should have been excluded by the military judge under Mil. R. Evid. 403. We specifically find the military judge did not clearly abuse his discretion with his Mil. R. Evid. 403 ruling on Mr. TH's report. We agree with the military judge's assessment on the probative value of the report and that the danger of confusion or misleading the members did not substantially outweigh its probative value.[8]

On appeal, the critical issue is whether Mr. TH prepared his report in anticipation of litigation such that it may have inherent reliability concerns under Mil. R. Evid. 803(6). On this point, the record of trial contains some details, but not many. For example, Mr. TH testified generally that he received input from either a legal office or an AFOSI investigating branch who asked him to try and find certain things in devices. He further agreed that this report was generated for a criminal investigation and he was asked specifically to review the music activity on SR's phone. On the other hand, Mr. TH testified his laboratory reports support all kinds of investigations including criminal and safety matters. The foundational testimony of Mr. TH did not explore in any useful detail other reliability concerns about the report. On the whole, we find the military judge's ruling lacked detail on whether Mr. TH prepared his report in anticipation of litigation and why the opponent of the evidence had failed to show the report lacked trustworthiness. *See Tearman*, 72 M.J. at 61; Mil. R. Evid. 803(6)(E). Therefore, we will assume *arguendo* that the military judge erred in admitting the report under Mil. R. Evid. 803(6) and conduct the next step of the analysis by testing whether the assumed error had a substantial influence on the findings using the four factors. *See Clark*, 62 M.J. at 200–01.

---

[8] Senior defense counsel mentioned Mr. TH's report may be cumulative, but when the military judge required him to submit his objections in writing via email, the Mil. R. Evid. 403 objection narrowed to only confusion or misleading the members. As we discuss more fully below in our harmless error analysis, significant overlap existed between Mr. TH's report and his PowerPoint timeline that was admitted without objection.

Beginning with the first factor, the strength of the Government's case, we find it weighs heavily in the Government's favor. Almost all of the evidence in Mr. TH's report, including the timeline of SR's phone, the user interactions, the gap in time with no user activity, the web searches, and the messages on her phone were contained in Mr. TH's separate PowerPoint timeline admitted as a prosecution exhibit without objection.

Senior defense counsel specifically addressed the admissibility of the PowerPoint timeline and indicated that he had no objection to the timeline multiple times *before* the military judge admitted Mr. TH's report as a business record. In arguing his Mil. R. Evid. 403 objection to Mr. TH's report, senior defense counsel stated, "[Mr. TH] is going to go through a timeline in detail with a PowerPoint presentation. I think that's sufficient. I think when we get into these other pieces of information, it just becomes confusing." Later, senior defense counsel stated, "I don't have a problem with the witness testifying to the timeline as [laid] out very clearly in the PowerPoint presentation. I don't know why then he also needs to introduce this report when he's going to go through this timeline in detail and explain to the members what these things mean." Simply put, while Mr. TH's report corroborated SR's testimony, we find the separately admitted PowerPoint timeline and Mr. TH's actual testimony covered this same ground. Additionally, we find SR's testimony credible, including the detailed description of why and how she decided to report Appellant to an adult. SR's testimony particularly was corroborated by the testimony of GQ and Ms. TB.

Turning to the second factor, the strength of the Defense's case, we find the Defense's case to be solid and its strength weighs in the Defense's favor. Trial defense counsel ably pointed out an inconsistency in SR's testimony under oath during motion practice and others in her initial report to SA IP which permitted the defense to receive the prior inconsistent statement instruction from the military judge. Trial defense counsel elicited evidence that SR did not fully disclose to her friends DC and GQ the details of Appellant's abuse. Trial defense counsel used the DNA results effectively even though the Government's expert testified she would not necessarily have expected to find DNA evidence under the circumstances of this case. Finally, SR's motives to misrepresent were questioned extensively, though not persuasively.

As we assess the third factor, the materiality of the evidence, we again mention the PowerPoint timeline admitted separately was by far the most powerful evidence to accompany Mr. TH's testimony. We find it provided the best corroboration of SR's testimony. The PowerPoint timeline used color coding, bolding, and local time. It would have been notably easier for the members to decipher. It does appear that the PowerPoint timeline omits the message that SR sent to DC asking him to "[d]efine rape." However, evidence of

this message was already before the members from SR's cross-examination, including where this message occurred in the greater timeline.

For the third factor we must also address that one page of Mr. TH's report, the portion that showed NC's phone activity, was not in his PowerPoint timeline. Mr. TH testified about NC's phone activity using his forensic report as a guide. On the other hand, NC did not testify at all. After considering all the findings evidence, we conclude that the portion of Mr. TH's report that addressed the timeline of NC's phone lacked materiality and added very little to the Prosecution's case. Certainly the content of NC's web activity and Internet searches had no relevance to the trial as they exclusively relate to food recipes. Instead, the only relevant information we discern is the almost 8-minute gap in user interactions between 23:45 and 23:53. It appears the almost 8-minute gap could corroborate SR's testimony that she heard NC go downstairs if NC did not take her phone with her downstairs and use it. But, there was no evidence as to the location of NC's phone when she went downstairs. In closing argument, the Prosecution only asked the members to "consider the timelines that we talked about of [NC's] phone." We also note that even if the military judge had sustained the objection, Mr. TH would have still been permitted to testify to the same time gap in NC's phone subject to the evidentiary requirements of Mil. R. Evid. 401 and 403. On the whole, we find the one page of the report related to NC's phone lacked materiality in almost every respect. To the extent we misapprehend the materiality of NC's timeline, Mr. TH's testimony was separately admissible on this point.

On the fourth factor, the quality of the evidence in question, we find the quality of Mr. TH's report to be high. It represented an accurate summary of a forensic extraction of two phones and his analysis. While the PowerPoint timeline was of a higher quality to the members, we conclude Mr. TH's report was reliable and of high quality.

After considering the four above factors, particularly the strength of the Government's evidence and the materiality of the Mr. TH's report, and the Government's burden to prove the assumed error was harmless, we find the admission of Mr. TH's report did not substantially influence the findings as all of its important pieces were contained in the PowerPoint timeline or the testimony of the witnesses.

## B. Burden of Proof Instruction

Prior to trial, the Defense filed a written request to modify the preliminary and closing instruction on the Prosecution's burden of proof. The Defense proposed this language: "[i]f, based on your consideration of the evidence, you are firmly convinced that the accused is guilty of the offense

charged, you *should* find him guilty." The standard Air Force instruction uses the word "must," not "should."

At trial, the Defense sought to distinguish the CAAF's analysis in *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017), which reviewed for plain error, and argued the CAAF's "analysis could have been different" had the instructional issue been preserved. Before our court, Appellant argues that when the military judge used the word "must" in the instruction instead of "should" as requested, he impermissibly informed the members that they were without power to nullify in returning their findings.

Whether a military judge properly instructed the court members is a question of law we review de novo. *McClour*, 76 M.J. at 25 (citation omitted). Appellant filed his assignment of error prior to our decision in *United States v. Shadricks*, 78 M.J. 720 (A.F. Ct. Crim. App. 2019), *rev. denied*, ___ M.J. ___, 2019 CAAF LEXIS 375 (28 May 2019) (mem.). In *Shadricks*, we stated "[n]othing about the CAAF's opinion in *McClour* suggests that court would have reached a different result had it applied a de novo standard of review." *Shadricks*, 78 M.J. at 723. As in *Shadricks*, the military judge in Appellant's case did not err when he used the word "must" instead of "should" in his preliminary and closing instructions on findings.

We considered Appellant's position that the instruction given deprived the court members of the *power* to nullify. *Cf. Horning v. District of Columbia*, 254 U.S. 135, 139 (1920) (finding no error where the jury was allowed the "technical right . . . to decide against the law and the facts"), *with United States v. Hardy*, 46 M.J. 67, 75 (C.A.A.F. 1997) (holding that "a court-martial panel does not have the right to nullify the lawful instructions of a military judge"). The Government responds by noting that several federal circuit courts have held it is permissible to instruct the jury it "has a duty" to find an accused guilty if convinced of guilt beyond a reasonable doubt. *See, e.g., United States v. Appolon*, 695 F.3d 44, 65 (1st Cir. 2012); *United States v. Carr*, 424 F.3d 213, 219–20 (2d Cir. 2005); *United States v. Pierre*, 974 F.2d 1355, 1357 (D.C. Cir. 1992); *United States v. Johnson*, 462 F.2d 423, 429 (3d Cir. 1972). The Government argues still more federal courts have found a trial judge may instruct the jury they "must find" the defendant guilty if they are convinced beyond a reasonable doubt of his guilt. *United States v. Stegmeier*, 701 F.3d 574, 582–83 (8th Cir. 2012); *United States v. Mejia*, 597 F.3d 1329, 1340–41 (D.C. Cir. 2010).

We find the military judge's instruction correctly informed the members of their duty to "take the law from the court, and apply that law to the facts as they find them to be from the evidence." *See Hardy*, 46 M.J. at 71 (quoting *Sparf v. United States*, 156 U.S. 51, 101–02 (1895)); Rule for Courts-Martial (R.C.M.) 502(a)(2). We conclude the instruction did nothing more. To the ex-

tent that a "court-martial panel has the power to render a decision that does not follow the judge's instructions" or "the power to nullify," that power need not be protected by the reasonable doubt instruction. *See Hardy*, 46 M.J. at 75. Instead, the power to nullify is protected by "the rules concerning the requirement for a general verdict, the prohibition against a directed guilty verdict, the protection against double jeopardy, and the rules that protect the deliberative process of a court-martial panel." *Id.* We are satisfied both that the military judge properly instructed the court members on the law regarding the Government's burden of proof and that the other protections mentioned in *Hardy* were in place to permit the power to nullify. *Id.*

## C. Legal and Factual Sufficiency

### 1. Additional Background

In addition to the sexual assault on 9 December 2015 described above, SR testified to several earlier incidents of abuse by Appellant. The first incident happened in November or December 2013 when SR was 11 years old while they lived at Whiteman AFB.

That day Appellant woke SR up in the morning, but did not leave her room like he normally would. After SR used the bathroom, Appellant stayed in her room and requested she come sit with him on her bed. Appellant asked SR if she knew what sex was. This question made SR feel uncomfortable. SR told Appellant that she learned about sex in school and a little from her mom. SR got up from the bed and went into the closet in her bedroom to get dressed. SR made it inside the closet, but the door would not close all the way because her room was messy. SR put on black, stretchy cargo pants and Appellant, now standing in the closet doorway, asked where SR got the pants. Appellant then placed his hand down the front of SR's pants, underneath her underwear, and touched her vagina. After touching SR in that manner for about 25 seconds, Appellant left and told SR to get ready for school. SR told her best friend at Whiteman AFB, KB, that Appellant had asked if SR knew what sex was but did not disclose that Appellant touched her vagina.

SR also testified about two incidents in March 2014 right after Appellant and his family moved to Ellsworth AFB. Upon arrival at Ellsworth, the family stayed in a temporary lodging facility (TLF) room on base for a week. The TLF room had one bedroom where Appellant, NC, and their 2-year-old son slept. SR, now 12 years old, and her 7-year-old stepsister, LO, slept on the pullout couch in the living room. One night, Appellant came out of the bedroom, looked at SR and then placed his penis on her face and head. SR turned her head to face LO who was still asleep. Appellant stepped back, then placed his penis on SR's head, back, and shoulders. SR testified that

Appellant put his penis on the back of her head a second time while everyone was asleep in the TLF and she was playing on her phone.

Once the family moved into their on-base house on Ellsworth AFB, SR testified that about once or twice a week, when he was home, Appellant would come into her bedroom and look at her and put his penis on any of her exposed skin. Sometimes SR pretended to be asleep, and would shift her body to try and make him stop. Sometimes, SR would wake up to Appellant touching her with his penis on her face or any exposed skin. Other times, SR would be sleeping in her younger brother's room, and Appellant would put his penis on her body anywhere that was outside of the blanket.

Also at the Ellsworth AFB house, Appellant would masturbate in front of SR. He did this in the hallway outside her room while making eye contact with her. SR reacted by either moving to where she could not see him or shutting her door. Once at the Ellsworth AFB house, Appellant entered SR's room while she was cleaning it. SR saw Appellant's pants down and him masturbating while he looked at her.

In the fall of 2015, SR testified that Appellant started to touch her differently. In addition to touching her exposed skin with his penis, Appellant started to put his fingers inside her vagina. He did this when SR would be laying belly-down in her bed. The last digital penetration of her vagina was the incident on 9 December 2015 which prompted SR to report to an adult.

Appellant, through his counsel, challenges the factual sufficiency of each of the court's findings urging us to have "significant concerns" about SR's credibility, motive to fabricate, and the quality of the Government's evidence. Appellant personally challenges legal and factual sufficiency. He raises 28 assertions related to SR's credibility. While we granted a motion to attach Appellant's 44-page affidavit, many of his assertions cannot be considered by us as "[o]ur assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A 1993)). Some of Appellant's assertions are tied to the evidence in the record of trial and we consider three of them: (1) there was no reasonable explanation why "the allegation" was not told to those closest to SR; (2) SR could not have heard her mother's footsteps while listening to music on 9 December 2015; and (3) SR failed to establish the identity of her assailant. Some of Appellant's assertions overlap with his counsel's. When appropriate, we analyze them together.

**2. Law**

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324–25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Importantly, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Wheeler*, 76 M.J. at 568 (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "In applying this test, 'we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution.'" *Id.* (quoting *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001)) (additional citation omitted).

"The test for a factual sufficiency review . . . is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, *the members of the service court are themselves convinced of appellant's guilt beyond a reasonable doubt.*'" *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation omitted); *see also Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). Just as with legal sufficiency, "[t]he term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *Lips*, 22 M.J. at 684).

**3. Elements and Definitions**

Appellant's sexual assault of a child conviction, based on the charged language, required the Government to prove three elements beyond a reasonable doubt: (1) that on divers occasions Appellant committed a sexual act upon SR by penetrating her vulva with his fingers; (2) that, at the time, SR had attained the age of 12 years but had not attained the age of 16 years; and (3) that Appellant did so to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.b.(3)(b). "Sexual act" means the penetration, however slight, of the vulva of another by any part of the body, with an intent to gratify the sexual desire of any person. *See MCM*, pt. IV, ¶ 45.a.(g)(1)(B).

Appellant's first sexual abuse of a child conviction, based on the charged language, required the Government to prove two elements beyond a reasonable doubt: (1) that Appellant committed a lewd act upon SR by touching her genitalia with his hand, with the intent to gratify his sexual desire; and (2) that, at the time, SR had not attained the age of 12 years.[9] *See MCM*, pt. IV, ¶ 45b.b.(4)(a).

Appellant's second sexual abuse of a child conviction, based on the charged language, required the Government to prove beyond a reasonable doubt: (1) that on divers occasions Appellant committed a lewd act upon SR by touching her face and body with his genitalia, with the intent to gratify his sexual desire; and (2) that, at the time, SR had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(4)(a).

Appellant's third conviction for sexual abuse of a child, based on the charged language, required the Government to prove beyond a reasonable doubt: (1) that on divers occasions Appellant committed a lewd act upon SR by intentionally exposing his genitalia, with the intent to gratify his sexual desire; and (2) that, at the time, SR had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(4)(c).

The same definitions apply to each of the sexual abuse of a child convictions. "Lewd act" means (a) any sexual contact with a child; or (b) intentionally exposing one's genitalia to a child by any means with an intent to gratify the sexual desires of any person. *See MCM*, pt. IV, ¶ 45b.a.(h)(5). "Child" means any person who has not attained the age of 16 years. *MCM*, pt. IV, ¶ 45b.a.(h)(4). "Sexual contact means—(A) touching, or causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person, with an intent to abuse, humiliate or degrade any person; or (B) any touching, or causing another person to touch, either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *See MCM*, pt. IV, ¶ 45.a.(g)(2). "Touching may be accomplished by any part of the body." *Id.*

### 4. Analysis

The primary evidence against Appellant was the testimony of SR. As described above, we find SR's testimony credible. We find her initial report to

---

[9] Normally, the offense of sexual abuse of a child only requires proof that a child had not attained the age of 16 years. However, the Government chose to use "the age of 12 years" in this specification.

DC and later report to Ms. TB to be credible. The PowerPoint timeline corroborates much of SR's testimony about her activities on the evening of 9 December 2015. The inactivity on SR's phone right in the middle of her conversations with DC corroborated SR's testimony on when Appellant entered her room. The inactivity lasted long enough for DC to ask "Hello," the equivalent of, "Are you there SR?" We address 15 challenges that Appellant and/or his counsel raise.

### a. SR did not report to her mother

The Defense correctly points out that SR did not report to her mother, NC, even after GQ encouraged SR to do so in September 2015. We do not find SR's decision to report to Ms. TB, instead of her mother, affects her credibility in the slightest. Ms. TB was a trusted adult, outside the immediate family, and an individual that SR knew well as a former teacher. SR took her best female friend, GQ, for moral support and the evidence produced at trial demonstrably shows how difficult it was for SR to report Appellant's behavior to an adult.

### b. SR denied Appellant abused her to her mother

The Defense points to SR's testimony that on one occasion NC told SR that if anyone was making her uncomfortable, SR could tell NC and NC would not be mad even if it was someone close to SR or NC. SR denied being abused. While it is not clear exactly when this conversation took place, it occurred after some of Appellant's abuse of SR had occurred. Appellant claims that the statement SR made to her mother is the actual truth and the allegations of abuse are totally false. We disagree. SR knew perfectly well that Appellant made her mother happy. She understood that if she reported Appellant she may be depriving her toddler brother of his dad. She delayed reporting intentionally, told her mother what she wanted to hear, and chose to share some details with her closest friends as she attempted to cope with the abuse.

### c. SR did not fully disclose details to her friends

The first friend SR confided in about Appellant's behavior was KB at Whiteman AFB. SR disclosed that Appellant asked if she knew what sex was. This was Appellant's prelude conversation with SR prior to putting his hand down her black stretchy cargo pants to touch her vagina, thereby committing the first abusive sexual contact. SR did not tell KB she was touched inappropriately because she did not want KB to think she was "gross." We find SR's explanation rational from the perspective of an 11-year-old who has just been touched inappropriately for the first time by her stepfather.

Similarly, SR did not fully disclose to GQ in September 2015 that Appellant was masturbating when he came into her room or that he had touched

her in a sexual way. Instead, SR disclosed some details that Appellant walked around without clothes, looked over her, and stared at her when she slept. SR asked GQ to not tell anyone. We do not find SR's choice to only disclose some details to GQ to meaningfully affect her credibility. We see consistency with SR providing partial disclosures to her closest friends while being very concerned about how these friends would view her. By the time she disclosed more fully to DC via text message, SR figured out that if her friends actually cared about her and wanted the best for her, they would still love her and want to be with her.

We reject Appellant's personal assertion that there was no reasonable explanation why "the allegation" was not told to those closest to SR, including her mother, other members of the family, and her best friends. We find SR's reasons for reporting to DC and then Ms. TB valid given the circumstances. The evidence produced at trial shows that SR made the decision to more fully report only after careful consideration of the consequences to her and her family.

### d. The Government's evidence contradicted SR's testimony

During cross-examination, trial defense counsel inquired about the specific songs by the band Train that SR was listening to when she was touched by Appellant on 9 December 2015. SR agreed she told SA IP that the touching lasted for "two full songs." When asked whether those two songs were "Mermaid" and "Bruises" by the band Train, SR testified "I think so." When SA TW testified, she explained that AFOSI pieced together the timeline based on SR's report that the touching occurred during these two specific songs.

The PowerPoint timeline of Mr. TH does show that SR listened to "Mermaid" and "Bruises" but those songs were over a few minutes before the long gap in user activity. The PowerPoint timeline also shows user interaction when the song "Mermaid" was played. Mr. TH opined the user interaction was the progress bar on the phone being adjusted while "Mermaid" played. At trial and before us, Appellant argues that he cannot have committed the offense during the song "Mermaid" as SR could not have manipulated her phone while it was under her pillow. In addressing this discrepancy, we first note that the evidence does not need to be free from conflict. Second, what song SR was listening to is not one of the charged elements of the offense. Therefore, this discrepancy is merely another challenge to SR's credibility and one we reject. Trial counsel argued during rebuttal that it was completely reasonable for SR to only remember the songs playing immediately before a traumatic event. We agree and note that SR correctly recalled both the band and record and only was incorrect on the specific songs.

Appellant personally raises a potential discrepancy that SR never explained how she could hear her mother's footsteps going downstairs while she was listening to music. We easily resolve this discrepancy. SR testified she could usually hear people moving when they went downstairs. As we confine our review to the evidence produced at trial, we find support in SR's testimony that she generally could hear people go downstairs and on this night she heard her mother go downstairs, and then she heard Appellant's footsteps. SR was never questioned on the volume of her music and so we rely on her unchallenged testimony that she could hear footsteps in her house as she generally did on other occasions.

### e. SR either wanted to move or did not want to move

Appellant's counsel presents alternative arguments: (1) that SR wanted to move to Kansas to live with her biological father; or (2) that Appellant was going to receive an assignment to either Kansas or Colorado upon return from his deployment and SR did not want to move from Ellsworth AFB. We considered the evidence produced at trial and find nothing that causes us to question SR's motive to accuse Appellant of sexual abuse so she could stay or leave Ellsworth AFB. SR provided reasonable explanations for why, at various times, she hoped to live nearer to her biological father or did not want to leave her close friends at the places she lived independent of her accusations against Appellant.

### f. Lack of DNA Evidence

As was done at trial, Appellant's counsel makes three arguments worthy of discussion about the DNA testing results. The claim is for SR's 9 December 2015 accusation to be true: (1) Appellant's DNA should have been found inside SR's vagina; (2) Appellant's DNA should have been found inside the shorts SR wore; and (3) SR's DNA should have been found under Appellant's fingernails. The Government's DNA expert, Ms. DB, opined on these three topics. Based on her knowledge of the case she made the following conclusions:

1. Ms. DB did not necessarily expect that Appellant's DNA would be found on the swabs from SR's vagina because they were collected approximately 36 hours after the digital penetration.

2. Ms. DB did not necessarily expect there to be male DNA inside SR's shorts given the possibilities of enough DNA being deposited and skin cells being lost prior to collection. While male DNA was actually found, Ms. DB opined the failure to obtain a DNA profile could be that not enough cellular material ended up inside the shorts.

3. Ms. DB did not necessarily expect SR's DNA to be under Appellant's fingernails as the swabs were collected approximately 20 hours after the digital penetration.

At trial and on appeal, the Defense attempted to use a study published in the *Journal of Forensic Nursing* to challenge the DNA expert's findings. This study collected vaginal swabs at multiple points in time over a 72-hour period from five adult females after digital penetration from another adult. The study found "at the time 72-hour post-penetration internal, one couple had a full composite [DNA] profile; two couples produced a nearly full composite profile, and two couples yielded respective partial composite profiles of seven and ten alleles. Of all possible alleles, 71 percent were detected for all combined couples at the 72-hour interval." According to Ms. DB, an allele is one marker of a DNA profile.

During Ms. DB's re-direct examination, she contrasted the study with the procedures used by USACIL in DNA testing. First, the study appeared to reference the use of low copy number DNA technology which USACIL does not perform due to reliability concerns. Ms. DB noted that low copy number DNA has to be treated with extreme caution. Second, in response to a member question, Ms. DB noted that the study collected samples at one hour, six hours, 12 hours, 24 hours, and 72 hours post-penetration and the couples continued their normal day-in and day-out activity during that 72-hour period. Third, in response to the same member question, she explained that the study used a composite DNA profile procedure that USACIL does not use. Essentially, a composite profile combined data from the "first vaginal swab, the second vaginal swab, [and] the third vaginal swab." By contrast, USACIL tests swabs individually. We note that USACIL had one vaginal swab of SR to test, taken approximately 36 hours after the accusation of penetration. By contrast, the study would have collected and completed composite testing of four samples collected prior to the 36 hour mark. Trial counsel aptly argued in rebuttal argument that the Defense was attempting to compare "apples to baseballs."

After carefully considering all the evidence produced at trial regarding DNA testing, we do not find the absence of Appellant's or SR's DNA to affect the legal and factual sufficiency of Appellant's sexual assault of SR on 9 December 2015.

### g. SR did not identify her Assailant

Appellant personally claims SR did not identify her assailant. We disagree. For each of the convictions, SR testified Appellant was the one who touched or penetrated her and intentionally exposed himself to her.

### *h. SR sought attention*

Appellant's counsel claims SR sought attention from DC by falsely reporting Appellant. The evidence produced at trial shows DC texted SR an outright lie that someone was "at his window with a knife" earlier on 9 December 2015. We considered whether DC's outright lie had any connection to SR's credibility. We find no such connection. SR addressed DC's comments in the context of her report to DC of Appellant's misconduct. "I thought [DC] was trying to make me like, I don't know get scared, or nervous, or something. But what happened—what I told him, that was completely—that was completely true." We find SR's explanation credible, especially in light of her prior reluctance to report details of Appellant's behavior to her other close friends.

### *i. SR accused Appellant to deflect attention from her conduct*

When SA IP initially interviewed SR, SR only disclosed that she texted GQ about Appellant's behavior. SR did not mention that she texted with DC and another friend about Appellant. At trial, SR admitted that she did not disclose the texts with DC to SA IP because she was embarrassed by what was on her phone in text messages with DC. SR explained, "I was nervous—I did something bad on my phone and I thought if I told her . . . they would take my phone. They wound up taking my phone anyways without me saying anything." SR explained she got in trouble from her mother and biological father for what she did on her phone. In response to a member question, SR agreed that what she did that was bad on her phone was "unrelated to anything about the allegations" against Appellant. We considered all the evidence produced during trial and do not find SR made up the accusations against Appellant to deflect attention from the "bad things" she was doing on her phone. We are persuaded by SR's testimony that the bad things she was doing on her phone were unrelated to her accusations against Appellant.

### *j. SR was not "uncomfortable" with Appellant*

Appellant's counsel claims that SR's actual behavior towards Appellant was inconsistent with her testimony that she felt "uncomfortable" around him. The evidence of SR's actual behavior produced at trial consisted of a single occasion when SR asked Appellant for permission to attend a high school football game with Appellant as her adult chaperone. SR explained in her testimony that she asked Appellant because he said yes to this type of request easier than her mother. SR planned to hang out with her friends at the football game and only needed Appellant to attend because she was not permitted to go to games by herself. We find SR's request to Appellant to accompany her to a high school football game so she could be with her friends does not affect her credibility on the abuse accusations.

### k. SR lied to AFOSI

Appellant's counsel avers that SR lied to AFOSI. SR admitted on cross-examination that she told SA IP that Appellant touched her once in TLF while she testified at trial to two incidents in TLF as described above. Even if we assume *arguendo* that SR's initial report to SA IP was accurate and her trial testimony was incorrect, we do not find such a discrepancy substantially affects SR's credibility. Therefore, we still find Appellant's conviction for abusive sexual contact of SR by touching her face and body with his genitalia, on divers occasions, legally and factually sufficient. SR credibly and consistently described one incident in TLF and multiple incidents in her on-base house on Ellsworth AFB where Appellant placed his genitalia on her face and body with the intent to gratify his sexual desire.

### l. SR's definition of rape proves she was not abused

Appellant's counsel argues that SR's definition of rape in her trial testimony shows she was not abused by Appellant. At trial, SR explained that she searched for the term "rape" on 9 December 2015 because she was confused about the difference between rape, child endangerment, or molestation. On cross-examination, SR agreed that she texted GQ in September 2015 that Appellant "hasn't raped me or anything so he can't get in trouble by the law." During re-direct examination senior trial counsel asked, "What did you think rape was?" without directing SR to a particular point in time. SR replied, "I thought rape was someone touching you, making you uncomfortable, just like sexualization of anybody, especially a little kid." Appellant avers that this testimony shows Appellant was not guilty of all of the offenses by SR's own definition of "rape." We disagree. We considered SR's testimony on the whole, including the testimony quoted above. We believe she credibly testified to each of the elements of the offenses of which Appellant was convicted. We need not resolve her personal understanding of definitions of rape, an offense for which Appellant was never charged, at any given point in time. We considered the substance of her definition of "rape" and after comparing it to her testimony as a whole we still find Appellant's convictions legally and factually sufficient.

### m. SR's accusations that she was assaulted in the same bed as her sleeping siblings are hard to believe

SR testified that her younger stepsister and her brother were asleep next to her on some of the occasions when Appellant touched her face and body with his genitalia, including in TLF on Ellsworth AFB. Appellant's counsel finds these accusations simply hard to believe. We find the evidence produced at trial is legally and factually sufficient to support the offense of abusive

sexual contact by placing his genitalia on her face and body on divers occasions even on occasions when SR's sleeping siblings were next to her in bed.

### n. Incomplete/inaccurate computer forensic analysis:

Appellant's counsel raises three concerns with the computer forensics: (1) the extraction of NC's phone was incomplete; (2) extraction itself does not retrieve data from some applications; and (3) Mr. TH's forensic laboratory report and his PowerPoint timeline omit important information. On the first two points, we find evidence produced at trial supported each of these conclusions. Still, we do not find either point impacts our conclusion that Appellant's convictions are legally and factually sufficient.

On the third point, we did not consider Mr. TH's forensic laboratory report in conducting our legal and factual sufficiency review as we assumed *arguendo* that the military judge erred by admitting it as a business record. Therefore, we do not address any perceived deficiencies in Mr. TH's forensic laboratory report.

We agree with Appellant that the PowerPoint timeline omits a portion of the text conversation between SR and DC sometime prior to SR asking DC to "[d]efine rape." Trial defense counsel elicited testimony about this text conversation between DC and SR. SR agreed she asked DC to "focus on me." Appellant attempted at trial and on appeal to tie this phrase to his second argument in this section that SR was seeking attention from DC by falsely reporting Appellant. We find Mr. TH did not omit important information when he did not include the "focus on me" and related messages in the PowerPoint timeline. It was reasonable for Mr. TH to determine the "focus on me" message was unrelated to the discussions that occurred after the "define rape" message. Considering Mr. TH's testimony and his PowerPoint timeline together, we decline to find them incomplete or inaccurate in any important manner.

### o. Evidence not presented at trial

The final challenge we address from Appellant's counsel is that the Government did not introduce certain evidence and that we should draw certain inferences from this lack of evidence. It is undisputed that (1) NC never testified; (2) SR was never asked during her testimony whether she was worried about her stepsister being abused; (3) other friends whom SR told about Appellant's misbehavior, at various times, did not testify; and (4) the doctor who performed SR's SAFE did not testify. Additionally, Appellant's counsel also argues there was no evidence Appellant ever sought to isolate SR and there was no evidence Appellant told SR not to tell anyone about his actions. The Government responds with "[t]his Court should not presume a fact because the Government did not call a witness, and should reject Appellant's invita-

tion to do so." We agree with the Government. We confine our legal and factual sufficiency review to the evidence produced at trial. *See Wheeler*, 76 M.J. at 568. Therefore, we need not discuss the above contentions or this issue further.

### *p. Conclusion on Legal and Factual Sufficiency*

After considering all of Appellant's challenges and drawing "every reasonable inference from the evidence of record in favor of the prosecution," the evidence is legally sufficient to support Appellant's convictions for sexual assault of a child and sexual abuse of a child. *Barner*, 56 M.J. at 134. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt of all four offenses beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's convictions for one specification of sexual assault of SR and three specifications of sexual abuse of SR are therefore both legally and factually sufficient.

## D. Post-trial Processing

### 1. Additional Background

Defense counsel's six-page letter was never included with the rest of Appellant's clemency submission in the original record of trial (ROT). On 10 July 2019, we ordered the Government to show good cause why we should not order new post-trial processing or take other corrective action. On 22 July 2019, the Government responded to our order and filed a motion to attach (1) a 1 February 2018 six-page clemency letter from Appellant's counsel; and (2) a declaration from the staff judge advocate (SJA), Colonel (Col) MJ, about Appellant's clemency submission. Together, these documents show the convening authority received and considered the defense counsel's letter during the clemency process. On 30 July 2019, we granted the unopposed motion to attach.

Ordinarily, we would next determine whether the omission of the defense's letter from the original record of trial was a "substantial omission [which] renders a record of trial incomplete and raises a presumption of prejudice that the government must rebut." *United States v. Harrow*, 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006) (citation omitted), *aff'd*, 65 M.J. 190 (C.A.A.F. 2007). However, this analysis is not required as we conclude the SJAR and defense clemency submission mischaracterized the convening authority's power under Article 60, UCMJ, 10 U.S.C. § 860, to act on the findings and sentence, and the addendum to the SJAR did nothing to correct these errors.

**2. Law**

Proper completion of post-trial processing is a question of law this court reviews de novo. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citation omitted). "Failure to timely comment on matters in the SJAR, or matters attached to the recommendation, forfeits any later claim of error in the absence of plain error." *United States v. LeBlanc*, 74 M.J. 650, 660 (A.F. Ct. Crim. App. 2015) (en banc) (citing R.C.M. 1106(f)(6); *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005)). To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) [the error] was plain or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (quoting *Scalo*, 60 M.J. at 436). The threshold for establishing prejudice from errors impacting an appellant's request for clemency from the convening authority is low, even in the context of plain error analysis, but there must be "some 'colorable showing of possible prejudice.'" *Id.* (quoting *Scalo*, 60 M.J. at 437).

In *United States v. Aiken*, we explained recent changes to Article 60 authority as follows:

> The National Defense Authorization Act (NDAA) for Fiscal Year 2014 modified Article 60, UCMJ, 10 U.S.C. § 860, and limited the convening authority's ability to grant clemency. Pub. L. No. 113–66, sec. 1702, § 860(c)(4)(A), 127 Stat. 954–58 (2013). The effective date of the change was 24 June 2014. *Id.* at 956. The pertinent text of the modified Article 60, UCMJ, providing for substantially less convening authority discretion to act on an adjudged sentence now reads, "[T]he convening authority or another person authorized to act under this section may not disapprove, commute, or suspend in whole or in part an adjudged sentence of confinement for more than six months or a sentence of dismissal, dishonorable discharge, or bad conduct discharge." 10 U.S.C. § 860(c)(4)(A) (24 Jun. 2014).

> Recognizing that a specification may allege a timeframe that "straddles" the effective date of the change to Article 60, UCMJ, the NDAA for Fiscal Year 2015 provided that, where a court-martial conviction involves an offense committed before 24 June 2014 and an offense committed on or after 24 June 2014, the convening authority has the same authority under Article 60 as was in effect before 24 June 2014, except with respect to a mandatory minimum sentence under Article 56(b), UCMJ, 10 U.S.C. § 856(b). Pub. L. No. 113–291, § 531, 128 Stat. 3292, 3365 (2014). Before 24 June 2014, the convening authority had the authority to dismiss any charge or specifica-

tion by setting aside a finding of guilty or to change a finding of guilty to a finding of guilty to a lesser included offense. The convening authority also had the authority to disapprove a sentence in whole or in part, mitigate the sentence, and change a punishment to one of a different nature so long as the severity of the punishment was not increased.[10]

No. ACM 39288, 2018 CCA LEXIS 366 at *5 (A.F. Ct. Crim. App. 20 Jul. 2018) (unpub. op.).

### 3. SJAR

On the court's findings of guilt, the SJAR advised the convening authority, *inter alia*, "[f]or the offense of sexual assault of a child you only have the authority to approve the finding of guilt." This advice was erroneous. Essentially, the SJAR incorrectly advised the convening authority that he had no choice but to approve the sexual abuse of a child conviction. Instead, the convening authority actually had the power to dismiss the conviction by setting it aside. The convening authority also had the power to change the finding of guilt of sexual assault of a child to a lesser included offense. All it took was one conviction with a charged timeframe before 24 June 2014 to give the convening authority the ability to dismiss *any charge or specification*, including the sexual assault of a child offense, with a charged timeframe completely after 24 June 2014. *See United States v. Rogers*, 76 M.J. 621, 625 (A.F. Ct. Crim. App. 2017). In this case, all three of the sexual abuse of a child offenses had a charged timeframe that began prior to 24 June 2014.

On the court's sentence, the SJAR correctly advised the convening authority that the dishonorable discharge was a mandatory minimum punishment. The SJAR also correctly advised the convening authority that he could "approve, disapprove, commute, or suspend in whole or in part the reduction to E-1. The SJAR said nothing about the convening authority's power to affect the eight years of confinement. This omission in the SJAR was exacerbated by the defense's clemency submission.

### 4. Defense Clemency Submission

The first paragraph of the defense counsel's letter requested, *inter alia*, that the convening authority "give your favorable recommendation that you would set aside the [findings for sexual assault of a child], as well as *the sen-*

---

[10] This reflects the language of R.C.M. 1107(d)(1) in effect prior to 24 June 2014 and as it appeared in the *MCM* (2012 ed.).

27

*tence* in this case, *if you had the authority to do so*." (emphasis added). In this statement, defense counsel repeated the SJAR's erroneous statement that the convening authority had no authority to dismiss the findings of guilt to sexual assault of a child. A similar statement was repeated by defense counsel in the last paragraph of the letter.

Additionally, the statement that requested a favorable recommendation to set aside "the sentence" was written broadly. Instead of limiting the language to the "mandatory dishonorable discharge" defense counsel essentially told the convening authority he could only make a favorable recommendation on the eight years of confinement. The convening authority could have reasonably interpreted the defense counsel's position and the silence of the SJAR on this point to conclude that he could not disapprove in whole or in part the eight years of confinement.

We do note that elsewhere in the defense counsel's letter, in the "law" section, she actually cited to our decision in *Rogers* and some portions of the Fiscal Year 2015 NDAA. However, it appears to us that these references were used to question whether the military judge erred in determining the dishonorable discharge was a mandatory minimum punishment. There is no analysis after the law section that contradicts the opening and closing paragraphs of the defense counsel's letter that the convening authority had limited power over the sentence as a whole and the sexual assault of a child conviction.

Appellant also wrote a letter to the convening authority professing that he "did not commit" the offenses. In the letter's opening paragraph, Appellant also wrote "I respectfully request that you . . . give your favorable recommendation that you would set aside the [findings for sexual assault of a child] and the sentence if you had the authority." This statement, which mirrors the defense counsel's letter, shows that Appellant also believed the convening authority had less authority under Article 60 than the law allowed.

### 5. Addendum to the SJAR and Analysis

The addendum to the SJAR did not correct the errors in the defense's submission or the errors in the original SJAR regarding Article 60 authority. We find plain error in the failure to correct these errors. The decisions in *United States v. Addison*, 75 M.J. 405 (C.A.A.F. 2016) (mem.) and *United States v. Zegarrundo*, 77 M.J. 612 (A.F. Ct. Crim. App. 2018) establish an obligation to correct such errors in the addendum.

The SJAR contained the first error that the convening authority could not dismiss the findings of guilt of the sexual assault of a child offense. This error carried over into the defense clemency submission. A second error emerged—that the convening authority could not disapprove "the sentence." The law required the addendum to the SJAR to fix errors in the defense's clemency

submission. Additionally, the addendum to the SJAR always presents an opportunity for an SJA to correct erroneous advice in the SJAR. Such corrections likely constitute a new matter and prompt notice and opportunity for the Defense to respond. *Zegarrundo*, 77 M.J. at 614; R.C.M. 1106(f)(7).

We briefly considered whether the absence of the "favorable recommendation" Appellant sought during clemency from the record of trial mattered to our analysis. Assuming *arguendo* that the convening authority actually declined to give a recommendation, it does not matter under the law. In light of *Addison* and *Zegarrundo*, we find the failure to correct the errors in the defense clemency submission constitutes a colorable showing of possible prejudice. The absence of a favorable recommendation from the convening authority does not correct the erroneous advice Appellant and the convening authority received. As such, we order new post-trial processing with conflict-free defense counsel.

### III. CONCLUSION

The action of the convening authority is **SET ASIDE**. The record of trial is returned to The Judge Advocate General for remand to the convening authority for new post-trial processing and conflict-free defense counsel consistent with this opinion. Article 66(e), UCMJ, 10 U.S.C. § 866(e). Thereafter, the record of trial will be returned to this court for completion of appellate review under Article 66, UCMJ.

We order page 4 of Appendix A to Appellant's assignments of error brief and pages 1–43 of Appendix B, his declaration, to be sealed in the original record of trial.[11]

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[11] We do not order similar corrective action to the Government's answer as it was properly filed under seal.